UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JOSEPH PALMIOTTI,

Plaintiff,

-v-

METROPOLITAN LIFE INSURANCE CO.,

Defendant.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 03/27/06

No. 04 Civ. 718 (LTS)(JCF)

## OPINION AND ORDER

APPEARANCES:

RIEMER & ASSOCIATES, LLC
  By: Scott M. Riemer, Esq.
60 East 42nd Street, 47th Floor
New York, NY 10165

*Attorneys for Plaintiff*

LESTER, SCHWAB, KATZ, & DWYER,
LLP
  By: Allan M. Marcus, Esq.
120 Broadway
New York, NY 10271
*Attorneys for Defendant*

LAURA TAYLOR SWAIN, United States District Judge

Plaintiff Joseph Palmiotti ("Plaintiff" or "Palmiotti") brings this action under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 et seq., challenging the decision of Defendant Metropolitan Life Insurance Co. ("Defendant" or "MetLife") to deny his claim for long term disability benefits. Defendant moves for summary judgment dismissing Plaintiff's claims in their entirety. Plaintiff also moves for summary judgment, seeking an order granting him long term disability benefits. The Court has jurisdiction of this action pursuant to 29 U.S.C. § 1132(e)(1) and 28 U.S.C. § 1331. For the following reasons, Defendant's motion for summary judgment is denied in its entirety and Plaintiff's motion for summary judgment is denied in part and granted in part.

## BACKGROUND

The following material facts are not in dispute unless stated otherwise. Palmiotti was employed as a salesperson at Credit Suisse First Boston Corporation ("CSFB") for approximately three years. (Pl.'s Rule 56.1 and Def.'s Resp. ¶¶ 1, 5.)[1] The job involved building client relationships with high net worth individuals in an effort to market CSFB's products and services. (Pl.'s Rule 56.1 and Def.'s Resp. ¶ 8.) There is a dispute as to the extent of the physical requirements of the job. (Pl.'s Rule 56.1 and Def.'s Resp. ¶ 7; Def.'s Rule 56.1 and Pl.'s Resp. ¶ 12.)

Palmiotti was diagnosed with Multiple Sclerosis ("MS") in March 2002, and his last day of work at CSFB was November 22, 2002. (Pl.'s Rule 56.1 and Def.'s Resp. ¶¶ 24, 25.)

---

[1] References to the parties' S.D.N.Y. Local Civil Rule 56.1 statements incorporate those statements' underlying evidentiary references.

On the basis of his MS, Palmiotti received short-term disability benefits from November 23, 2002, through May 22, 2003. (Def.'s Rule 56.1 and Pl.'s Resp. ¶ 15.) As a CSFB employee, Palmiotti was also eligible to participate in the CSFB Long Term Disability Plan (the "Plan") and was entitled to long term disability ("LTD") benefits in case he became disabled as defined by the Plan. (Pl.'s Rule 56.1 and Def.'s Resp. ¶¶ 1, 3.) Plan benefits are provided through an insurance policy issued by MetLife. MetLife administers claims under the Plan.

*The Plan Documents*

Documentation of the Plan's terms has been submitted to the Court as Exhibit A attached to the Affidavit of Laura Sullivan ("Sullivan Aff.") in support of MetLife's motion for summary judgment and Exhibit A attached to the Affidavit of Steven Marom ("Marom Aff.") in support of MetLife's motion for summary judgment. It consists principally of three documents: a Master Policy; an LTD Booklet, which includes the Certificate of Insurance; and an Employee Benefits Handbook.

The Master Policy ( the "Policy") provides basic information regarding the benefits afforded to CSFB employees and the process by which exhibits and amendments are incorporated into the Policy. (Sullivan Aff., Ex. A at ML 0562-0583.) According to the Policy, MetLife and CSFB entered into Group Insurance Policy No. 1145128-G as of July 1, 1995. (See id. at ML 0562.) Section 2 of the Policy provides that insurance eligibility provisions relating to covered employees are set forth in applicable Exhibits to the Policy. (Id. at ML 0564.) Section 10 provides:

> Metropolitan will furnish certificates to the Employer for delivery to each Employee who is insured. The certificate will state the insurance protection to which the Employee is

entitled and to whom the benefits will be paid. The certificate will set forth the provisions of this Policy which mainly affect the Employee. The word "certificate" includes riders and supplements to the certificate, if any.

(Id. at ML 0568.) Section 17 provides:

No change in this Policy will be valid unless it is approved by an authorized officer of Metropolitan. Each such change must be evidenced by an amendment signed by both the Employer and by Metropolitan *or* by an endorsement signed by Metropolitan.

(Id. at ML 0570, emph. supplied.) Amendment No. 4 to the Policy, bearing the endorsement of Gwenn L. Carr, Vice President and Secretary of MetLife, effective January 1, 2002, added LTD Benefits to the Policy and added Exhibit 3, which is described in the amended Schedule of Exhibits as "Form G.24303 Series with any numerical and alphabetical suffix as shown in the Exhibit," and as applicable to "All Full-time Employees eligible for Long Term Disability Benefits." (Id. at ML 0582, 0575)

The LTD Booklet, which includes the Certificate of Insurance, summarizes the LTD benefits to which CSFB employees are entitled and the process by which participants can claim these benefits. (Id. at ML 0584-0645.) This booklet begins with a cover page labeled "Your Employee Benefit Plan/Credit Suisse First Boston Corporation/Long Term Disability/Effective January 1, 2002/MetLife." (Id. at ML 0584.) The following page, labeled "Introduction," recites that the employee is being presented with a Certificate of Insurance for group disability insurance and that the Certificate "states your benefits and summarizes some special services available to you at no additional cost." (Id. at ML 0585.) The Introduction also refers to a "Social Security Assistance Program" and an "Easy Claim Application Process" as elements of the "comprehensive disability program." (Id.) The following section is titled "CERTIFICATE OF INSURANCE for the Employees of Credit Suisse First Boston

Corporation," refers to Group Policy No. 1145128-G, and is labeled "Form G.24303-Cert." (Id. at ML 0587). Page 10 of the following portion of the booklet defines "Disability," in pertinent part, as follows:

> "Disabled" or "Disability" means that, due to sickness . . . , you are receiving Appropriate Care and Treatment from a Doctor on a continuing basis and you are unable to earn more than 80% of your Predisability Earnings . . . at your Own Occupation for any employer in your Local Economy.

(Id. at ML 0602.) "Own Occupation" is defined as "the activity that you regularly perform and that serves as your source of income. It is not limited to the specific position you held with your Employer. It may be a similar activity that could be performed with your Employer or any other employer." (Id. at ML 603.) The numbered pages of the booklet are followed by a page labeled "THIS PAGE IS INTENTIONALLY BLANK" and then by a lengthy group of unnumbered pages that include descriptions of "Special Services" (including the "Social Security Assistance Program" referred to in the Booklet's introductory section), an "ERISA Information" section, and a "Claims Information" section. (Id. at ML 0625-0642.)

The portion of the Claims Information section describing the initial claims determination procedure indicates that MetLife will review claims and notify the claimant as to whether it has approved or denied the claim, and continues:

> If MetLife denies your claim in whole or in part, the notification of the claims decision will state the reason why your claim was denied and reference the specific Plan provision(s) on which the denial is based. If the claim is denied because MetLife did not receive sufficient information, the claims decision will describe the additional information needed and explain why such information is needed.

(Id. at ML 0635-0636.) The claims appeal process is also described; this portion of the booklet provides in pertinent part that

[a]fter MetLife receives your written request appealing the initial determination, MetLife

will conduct a full and fair review of your claim. Deference will not be given to the initial denial, and MetLife's review will look at the claim anew. The review on appeal will take into account all comments, documents, records, and other information that you submit relating to your claim without regard to whether such information was submitted or considered in the initial determination . . . . If the initial denial is based in whole or in part on a medical judgment, MetLife will consult with a health care professional with appropriate training and experience in the field of medicine involved in the medical judgment.

(Id. at ML 0637.) A section labeled "Discretionary Authority of Plan Administrator and Other Plan Fiduciaries" reads in its entirety as follows:

In carrying our their respective responsibilities under the Plan, the Plan administrator and other Plan fiduciaries shall have discretionary authority to interpret the terms of the Plan and to determine eligibility for and entitlement to Plan benefits in accordance with the terms of the Plan. Any interpretation or determination made pursuant to such discretionary authority shall be given full force and effect, unless it can be shown that the interpretation or determination was arbitrary and capricious.

(Id. at ML 0638.)

In or about July 2002, CSFB distributed an "Employee Benefits Handbook." (Marom Aff. ¶ 2; Ex. A at ML 0650-0785.) This single booklet apparently functions as the Summary Plan Description ("SPD")[2] for CSFB's various employee benefit plans and programs and informs recipients that it "summarizes various legal plan documents and contracts. If there is any difference between this handbook and those documents and contracts, the documents and contracts govern." (Marom Aff., Ex. A at ML 0650.) The "Claims" section of the LTD portion of the Handbook refers readers to the MetLife LTD Booklet described above, and reads in its entirety as follows:

In the event of a claim, the benefits administrators . . . should be notified immediately so that the insurance carrier can process the claim for review. For additional information

---

[2]    See  ERISA § 102, 29 U.S.C. § 1022 (requiring distribution of an SPD).

regarding the claims procedure, including details on the filing and appeals process, refer to the "Your Employee Benefit Plan - Long Term Disability" booklet available, free of charge, in the Online Resources section of [the benefits administrator's website] or upon request to [the benefits administrator] . . .

(Id. at ML 0712).

CSFB maintains no other formal Plan documentation. (See Sullivan Aff.; Marom Aff.)

*Palmiotti's Claim*

On or about May 6, 2003, Palmiotti submitted an application for LTD benefits. (Pl.'s Rule 56.1 and Def.'s Resp. ¶ 36.) Plaintiff's application included four physician reports diagnosing Plaintiff with MS (Dr. Brian Apatoff, Dr. Michael Rendel, Dr. Carl Braun, and Dr. Maureen Cafferty), along with two MRI scans and an "Employee Statement" form filled out by Plaintiff. (Id. at ¶¶ 36-42.) Dr. Cafferty's report, dated March 5, 2003, indicated largely normal physical and neurological exams and noted Plaintiff's statement that he "actually feels better now that he swims and has started biking again." (Sullivan Aff., Ex. B at ML 0022-0023.) Dr. Rendel's report, dated April 22, 2003, indicated that Plaintiff was only able to engage in limited stress situations and could sit, at most, for four hours continuously. (Id. at ML 0046-0048.) Dr. Rendel concluded that Plaintiff cannot work, with no improvement expected. (Id. at ML 0047.) Dr. Apatoff's report, dated May 1, 2003, indicated that Plaintiff could sit for two hours intermittently and concluded that Plaintiff cannot return to work because of his progressive neurological complaints. (Id. at ML 0052-0054.)

By letter dated May 28, 2003, MetLife denied Palmiotti's application for LTD benefits. (Id. at ML 0083-0085.) The denial letter identified lack of medical information showing the "severity" of Plaintiff's condition and how it impairs him from functioning in his occupation

as the principal defect in the claim. (Id. at ML 0084.) The letter cited Dr. Cafferty's report in which she noted Plaintiff's statement that he was feeling better now that he swims and started biking again. (Id.) The letter also commented that Plaintiff's self-reported day to day activities "are not severely impaired, as [he] exercise[s] approximately 5-6 times a week, do[es] some household chores at least once daily, and some gardening," and noted his involvement in "family activities." (Id.) The letter indicated that "[i]t appears that fatigue is the primary impairing symptom or complaint, but your Personal Profile Evaluation and your examinations on file are not consistent with an individual with a severe impairing fatigue," and concluded: "In summary, the medical documentation submitted does not support the severity of your condition, or how it impairs you from functioning at your Own Occupation." (Id.)

By letters dated June 19, 2003, July 31, 2003, and September 10, 2003, Plaintiff's attorney requested copies of all pertinent documents relating to the denial of the claim (id. at ML 0093-94, 0146-0148), including a "description pursuant to 29 C.F.R. 2560.503-1(g)(1)(iii) of any additional material or information necessary for Mr. Palmiotti to perfect the claim and an explanation of why such material or information is necessary." (Id. at ML 0094, 0148.) The record does not indicate that MetLife provided Palmiotti with the required description and explanation. In fact, the materials sent to Palmiotti on or about September 24, 2003, included an annotated copy of Plaintiff's attorney's July 31, 2003, letter, with "n/a" written next to Palmiotti's specific request for the identification of any additional information necessary to perfect his claim. (Riemer Aff., Ex. C at 2.) The claim denial documentation that MetLife provided to Palmiotti did not include notice of the May 15, 2003, findings by MetLife's nurse consultant, M. Truchon-Jones (Sullivan Aff., Ex. B at ML 0013), regarding specific deficiencies in Palmiotti's medical

documentation. (See Riemer Aff., Ex. C.)

On November 12, 2003, Palmiotti submitted an appeal of the denial of his LTD benefits with the following additional materials: a letter from Plaintiff's attorney reviewing the contents of the submission and arguing its sufficiency to demonstrate Palmiotti's entitlement to benefits; an affidavit, sworn to by Plaintiff on November 10, 2003, detailing further his assertions regarding his MS-related complaints and symptoms and his physical capabilities; a description of Plaintiff's job; Dr. Apatoff's September 11, 2003, MS Questionnaire and medical records; Dr. Rendel's medical records; Dr. Braun's medical records; and an article by a Dr. Ackerman on the effect of stress on MS. The medical records included copies of handwritten treatment notes. (Pl.'s Rule 56.1 and Def.'s Resp. ¶ 61; Sullivan Aff., Ex. B at ML 0152-0323.) Dr. Apatoff's questionnaire responses detailed Palmiotti's symptoms, including his complaints of stress, fatigue, and depression. (Sullivan Aff., Ex. B at ML 0164.)

MetLife sent at least some portions of Palmiotti's appeal package to Dr. Joseph Jares, MetLife's designated neurological expert, for review, with a referral form. (Id. at ML 0327-0329; Riemer's Aff., Ex. B at 54.)[3] The referral form instructed Dr. Jares not to contact the attending physician via phone for physician file review. (Sullivan Aff., Ex. B at ML 0327.) The referral form listed Palmiotti's job title as "Salesperson" and indicated that the attachments to the referral consisted of the job description and "clinical attachments," including "Consultant Reports, Diagnostics Reports, Labs, Office/Progress Notes, Pathology Reports." (Id. ML 0328.) The final

---

[3]    It is unclear whether the records provided to Dr. Jares for review included Palmiotti's affidavit or the argumentative material submitted by his attorney. (See Sullivan Aff., Ex. B at ML 0332; Def.'s Opp. to Summary Judgment at 10 n.6, "It is not entirely clear whether Palmiotti's attorney-prepared Affidavit was included in the materials referred to in Dr. Jares' report as 'misc.'")

page of the referral form, titled "Additional questions to be addressed by the provider," instructed

the reviewer to state whether "the medical documentation on file support functional limitations

and the claimant's inability to function at his own occupation [and] [i]f the answer . . . is no, [to

identify] what information/documentation is lacking to support the claimant's inability to function

and/or work?" (Id. at ML 0329.)

Dr. Jares submitted a report, dated December 22, 2003, detailing his conclusions

on Plaintiff's medical condition. (Id. at ML 0332-0336.) Upon review of the submitted records,

Dr. Jares found that, while Plaintiff suffers from MS, "[t]he records do not support a significant

impairment of [Plaintiff] in his own occupation." (Id. at ML 0336.)

The opening paragraph of the "Assessment" section of Dr. Jares' report reads as

follows:

> A thorough review of the medical records was completed. The medical records submitted
> indicate that Mr. Palmiotte [sic] has been employed as a financial consultant, which is a
> very high stressed position. They also indicate that he has been a very physically active
> individual participating in men's sports as well as enjoying activities such as gardening
> and household work.

(Id. at ML 0333.) The report goes on to indicate that the notes of Dr. Rendel (Palmiotti's primary

physician) "were not signed, nor particularly eligible [sic]" (id. at ML 0333; Pl.'s Rule 56.1 and

Def.'s Resp. ¶ 108) and that "most of Dr. Apatoff's progress notes are handwritten and are very

difficult to decipher." (Sullivan Aff., Ex. B at ML 0334.) After the discussion of Dr. Cafferty's

report, Dr. Jares stated that "[t]here are no further notes from her office. Please note there are no

reports of any neuropsychological test submitted, nor there [sic] any reports from any mental

health providers submitted." (Id. at ML 0335.) He went on to conclude that, from a neurological

perspective, and based on the medical records provided,

Mr. Palmiotte has a mild impairment based upon objective findings. . . . His fatigue and depression are not quantifiable in a scientific manner. There have been no attempts to quantify his stress, nor has [sic] there been any neuropsychological or cognitive difficulties. Mr. Palmiotte retains ability to work in his own occupation as a financial advisor/consultant based upon his retained cognitive abilities. His occupation is namely [sic] that of a sedentary intellectual rather than physical one. Namely, this is a mentally challenging occupation, but it does not require physical stamina. There has been no demonstration of any cognitive loss or disturbance of site references need due to the fact [sic] by his various providers including Dr. Apatoff. He [sic] does appear that there are some ongoing issues regarding depression, but this has not been addressed by any of his providers. It does not appear that there has been any treatment offer for depression such as use of antidepressant medication.

From the medical records, Mr. Palmiotte retains fairly significant functional ability given the fact that he is still able to run although for short distances, still able to do light physical activities such as light household chores, and still able to do some degree of outdoor work. His neurologic examination does show minimal neurological deficit.

(Id. at ML 0335.)

Dr. Jares responded to the referral form's questions concerning 1) whether the medical documentation supported functional limitations and Palmiotti's inability to function in his own occupation and 2) what documentation is lacking to support Palmiotti's inability to function and/or work as follows:

Mr. Palmiotte retains the ability to work as a financial consultant or advisor based upon his retained intellectual ability. His occupation is mainly cognitive rather than physical and can be performed without the need for travel or physical exertion. He has reported some difficulty with cognitive function and depression, but these have not been substantiated any [sic] of the reports submitted. If there is such information available, I would be happy to review it and provide an addendum. Mr. Palmiotte, based upon his description of his daily activities and his relatively normal neurological examination, is capable of working in sedentary fashion. The records do not support a significant impairment of Mr. Palmiotte in his own occupation.

There is no report of any formal neuropsychological testing or psychiatric assessment to validate the complaints of cognitive disturbance or behavioral disturbance, which would affect his ability to function as a financial consultant.

(Id. at ML 0336.)

Finally, on an "Estimation of Physical Capacities" worksheet, Dr. Jares indicated

that Palmiotti has no restrictions on sitting, standing, or walking due to his MS and that he can

carry 20 pounds frequently, with no restrictions on extremity function. (Id. at ML 0337.) The

only boxes on the form that Dr. Jares marked "never" with respect to physical capabilities during

work were those for working in conditions involving marked changes in temperature and

humidity, proximity to moving mechanical parts, and high exposed places. (Id. at ML 0338.) The

printed worksheet concluded with the legend: "This evaluation is based solely upon the medical

records available at the time of this review, which includes clinical evaluations, diagnostic test

results and objective medical data. The reviewer did not examine the patient. In addition, the

reviewer has completed this form in association with the definitions regarding the various

categories contained herein. (see attached)" (Id.)[4]

On December 30, 2003, Rosemary Harmon, a MetLife appeals specialist, denied

Palmiotti's appeal for LTD benefits on the ground that Plaintiff's MS was not severe enough to

prevent him from working in his regular occupation. (Def.'s Rule 56.1 and Pl.'s Resp. ¶ 37;

Sullivan Aff., Ex. B at ML 0339-0341; Riemer Aff., Ex. B at 62.) In her denial letter, Harmon

stated that "[a]ll available documentation has been carefully reviewed." (Sullivan Aff., Ex. B at

ML 0339.) She specifically cited to Dr. Cafferty's examination, including Palmiotti's normal

physical exam and statement that he was feeling better, and Dr. Apatoff's statements regarding

Palmiotti's subjective complaints. (Id. at ML 0340.) She summarized Dr. Jares' observations that

---

[4]    No definitions were attached to the copy of the form submitted to the Court by
MetLife.

there were no attempts to quantify Palmiotti's stress, fatigue, and depression and that the objective

findings indicate only mild impairment. (Id.) Finally, she reiterated Dr. Jares' conclusion that

Palmiotti can work at his profession because it is primarily that of "a sedentary intellectual nature

rather than physical one." (Id.)

Plaintiff subsequently filed suit in this District seeking, inter alia, a declaratory

judgment pursuant to ERISA section 502(a)(1)(B) finding him entitled to LTD benefits. (Compl.

¶¶ 15-20.)


## DISCUSSION

Summary judgment shall be granted in favor of a moving party where the

"pleadings, depositions, answers to interrogatories, and admissions on file, together with the

affidavits, if any, show that there is no genuine issue as to any material fact and that the moving

party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In the summary

judgment context, a fact is material "if it 'might affect the outcome of the suit under the governing

law,'" and "[a]n issue of fact is 'genuine' if 'the evidence is such that a reasonable jury could

return a verdict for the nonmoving party.'" Holtz v. Rockefeller & Co., 258 F.3d 62, 69 (2d Cir.

2001) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). The Second Circuit

has explained that the "party against whom summary judgment is sought . . . 'must do more than

simply show that there is some metaphysical doubt as to the material facts. . . . [T]he nonmoving

party must come forward with specific facts showing that there is a genuine issue for trial.'"

Caldarola v. Calabrese, 298 F.3d 156, 160 (2d Cir. 2002) (quoting Matsushita Elec. Indus. Co. v.

Zenith Radio Corp., 475 U.S. 574, 586-87 (1986) (alteration in original)). "[M]ere conclusory

allegations, speculation or conjecture," will not provide a sufficient basis for a non-moving party to resist summary judgment. Cifarelli v. Vill. of Babylon, 93 F.3d 47, 51 (2d Cir. 1996).

When cross-motions for summary judgment are filed, "the standard is the same as that for individual motions for summary judgment." Natural Res. Def. Council v. Evans, 254 F. Supp. 2d 434, 438 (S.D.N.Y. 2003). "The court must consider each motion independently of the other and, when evaluating each, the court must consider the facts in the light most favorable to the non-moving party." Id. (citing Morales v. Quintel Entm't, Inc., 249 F.3d 115, 121 (2d Cir. 2001)).


*MetLife's Discretionary Authority to Determine Long Term Benefits Under the Plan*

Under 29 U.S.C. § 1132 (a)(1)(B), a party may bring suit to recover benefits due under an employee benefit plan. "[A] denial of benefits challenged under § 1132 (a)(1)(B) is to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." Kinstler v. First Reliance Standard Life Ins. Co., 181 F.3d 243, 249 (2d Cir. 1999). In cases where the plan does confer such discretionary authority, courts review the denial of benefits under the more deferential arbitrary and capricious standard and overturn a decision only if it is "without reason, unsupported by substantial evidence or erroneous as a matter of law." Id. (internal quotations omitted). The plan administrator or fiduciary bears the burden of showing that the plan reserves discretionary authority to it so that the arbitrary and capricious standard can apply. Id. The documents must convey "a clear reservation of discretion to the plan administrator." Id. at 245. See also Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 108 (1989).

Plaintiff argues that the CSFB/MetLife Plan documents do not establish a clear reservation to MetLife of discretionary authority to determine LTD benefits, so that the appropriate standard for reviewing the denial of benefits to Palmiotti is de novo. MetLife, on the other hand, argues that the documents do establish such discretionary authority, so that the appropriate standard is arbitrary and capricious.

There is no debate that the Plan reserves MetLife the discretion to interpret the terms, conditions, and provisions of the insurance contract. (Pl.'s Rule 56.1 and Def.'s Resp. ¶ 11; Sullivan Aff., Ex. A at ML 0587.) The issue is whether the Plan documents give MetLife the discretion to determine LTD benefits. MetLife's argument in this regard focuses on a paragraph, titled "Discretionary Authority of Plan Administrator and Other Plan Fiduciaries" and contained in the LTD Booklet, which provides that:

> In carrying our their respective responsibilities under the Plan, the Plan administrator and other Plan fiduciaries shall have discretionary authority to interpret the terms of the Plan and to determine eligibility for and entitlement to Plan benefits in accordance with the terms of the Plan. Any interpretation or determination made pursuant to such discretionary authority shall be given full force and effect, unless it can be shown that the interpretation or determination was arbitrary and capricious.

(Sullivan Aff., Ex. A at ML 0638.) This paragraph clearly provides that Plan fiduciaries such as MetLife, which has fiduciary responsibility for benefit determinations, have discretion in making the determinations within their areas of responsibility.[5] The parties dispute, however, whether the paragraph is properly part of the Plan documents. The Court finds that there is no genuine issue

---

[5] "[A] person is a fiduciary with respect to a plan to the extent . . . he has any discretionary authority or discretionary responsibility in the administration of such plan." ERISA § 3(21)(A), 29 U.S.C.A. § 1002(21)(A) (West 2005); see also Winkler v. Metropolitan Life Ins. Co., No. 03 Civ. 9656 (SAS), 2004 WL 1687202, at *2 n.20 (S.D.N.Y. July 27, 2004).

of fact as to whether the paragraph is part of the Plan documents.

The affidavits and exhibits of record indicate that the LTD Booklet (consisting of the Certificate of Insurance and supplementary provisions, including the discretionary authority paragraph) was incorporated as an Exhibit to the Master Policy in a manner consistent with the Certificate of Insurance and Amendment provisions of the Policy.[6] The first page of the Master Policy shows that MetLife and CSFB entered into group insurance policy No. 1145128-G as of July 1, 1995. (Sullivan Aff., Ex. A at ML 0562.) The Policy explicitly provides that insurance eligibility provisions relating to covered employees are set forth in applicable Exhibits to the Policy (id. at ML 0564, section 2); it contemplates that MetLife will furnish certificates to the employer concerning the employee's insurance policy and defines these certificates to include riders and supplements. (Id. at ML 0568, section 10.) The Claims section of the LTD Booklet, which includes the discretionary authority paragraph, can therefore properly be characterized as a rider or supplement to the Certificate of Insurance.

The Certificate, along with the supplemental sections (constituting the LTD Booklet as a whole), was incorporated into the Master Policy as Exhibit 3, pursuant to Amendment No. 4 to the Master Policy. (See id. at ML 0575; ML 0582.) This incorporation is evidenced by the fact that the date of the relevant amendment ("January 1, 2002") corresponds to the date the LTD Booklet became effective as indicated on the introductory page. (See id. at ML

---

[6]     Plaintiff argues that the "Sullivan and Marom affidavits are inadmissible as extrinsic evidence because the contract is clear from its own terms and there is no need to supplement the administrative record." (Pl.'s Opp. to Summary Judgment, dated June 6, 2005, at 4 n.2.) While the Court agrees that the exhibits can speak for themselves, the Court finds that the affidavits are useful and admissible insofar as they constitute the relevant testimony of individuals who have knowledge of business records regarding the Plan.

0584.) The Certificate of Insurance, on the third page of the LTD Booklet, also explicitly references the group Master Policy number and the corresponding form number of Exhibit 3. (See id. at ML 0587.)

The SPD also supports the conclusion that the LTD Booklet is an official plan document. The "Claims" section of the LTD portion of the SPD specifically refers readers to the MetLife LTD Booklet for additional information regarding the claims procedure. (See Marom Aff., Ex. A at ML 712.) It is important to note here that the relevant ERISA provisions do not restrict the number or the kinds of documents that can constitute a written plan. See ERISA § 402, 29 U.S.C. § 1102 (2005) (plan to be established and maintained pursuant to written instrument); and ERISA § 404(a)(1)(D), 29 U.S.C.A. § 1104(a)(1)(D) (West 2005) (requiring performance of fiduciary's responsibilities "in accordance with the documents and instruments governing the plan"). It is therefore permissible for the Master Policy and the LTD Booklet to comprise the official Plan documents.

Moreover, the discretionary authority paragraph is consistent with other provisions of the LTD Booklet relating to benefit determinations and with the Plan terms as summarized in the SPD. The LTD Booklet includes the statements: "You will be paid a Monthly Benefit . . . if we determine that . . . you are Disabled . . . ."; and "When we determine you are Disabled . . . [,] Monthly Benefits are paid one month after you qualify for them." (Sullivan Aff., Ex. A at ML 0600, 0621.) The term "we" in these sentences refers to MetLife. (Id. at ML 0587.) The SPD instructs participants that "proof of disability satisfactory to the insurance company must be provided upon request" in order to receive benefits. (Marom Aff., Ex. A at ML 0708.) Though these passages may not alone be sufficient to grant MetLife discretionary authority to determine

eligibility of LTD benefits,[7] they are consistent with the LTD Booklet's explicit grant of discretionary authority to MetLife.

Plaintiff's proffer of MetLife's discovery admission that the discretionary authority paragraph in the LTD Booklet is not part of the MetLife "form" referred to in the Group Policy's Schedule of Exhibits (see Riemer Aff., Ex. A., Requests and Responses ¶ 16) does not raise any genuine issue of material fact as to whether the language is part of the insurance agreement defining the terms of the Plan. In light of the Policy's specific definition of "certificate" to include riders and supplements to the certificate and the fact that the Plan's key eligibility and coverage terms, as well as its claims administration information, are contained in the descriptive portions of the LTD Booklet rather than on the Certificate page labeled with the form number (see Sullivan Aff., Ex. A at ML 0587), no reasonable fact finder could determine on this record that the discretionary authority language was not made part of the governing Plan terms. Accordingly, the arbitrary and capricious standard of review applies in connection with MetLife's denial of Palmiotti's application for LTD benefits.

---

[7]    See Nichols v. Prudential Ins. Co., 406 F.3d 98, 108-109 (2d Cir. 2005) (finding that the phrase "to 'submit satisfactory proof of Total Disability to [the plan administrator]' was [too] ambiguous " to confer discretionary authority and that the phrase "when Prudential determines" that the relevant conditions are met was also insufficient to confer discretionary authority). See also O'Shea v. First Manhattan Co. Thrift Plan & Trust, 55 F.3d 109, 112 (2d Cir. 1995) (finding that the phrase "[t]he Trustees shall determine any questions arising in the administration, interpretation, and application of the Plan, which determination shall be binding and conclusive" was a clear reservation of discretionary authority triggering arbitrary and capricious standard of review).

*MetLife's Denial of LTD Benefits*

The Court now turns to the questions of whether MetLife provided a full and fair review process as required by ERISA and, ultimately, whether its appellate determination denying Plaintiff's claim was arbitrary and capricious.

ERISA mandates that an employee benefit plan "afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim." ERISA § 503(2), 29 U.S.C.A. § 1133(2) (West 2006). The purpose of this full and fair review is to provide claimants with sufficient information to prepare for further administrative review or appeal to the federal courts. Juliano v. HMO of N.J., Inc., 221 F.3d 279, 287 (2d Cir. 2000). Such a review requires the claims administrator to "notify the participant promptly, in writing and in language likely to be understood by laymen, that the claim has been denied with the specific reasons therefor." Hammer v. First Unum Life Ins. Co., No. 01 Civ. 9307 (RCC), 2004 WL 1900334, at *4 (S.D.N.Y. Aug. 25, 2004), aff'd, 2005 WL 3527631 (2d Cir. 2005). The administrator "must also inform the participant of what evidence he relied upon and provide him with an opportunity to examine that evidence and to submit written comments or rebuttal documentary evidence." Id. However, the "Second Circuit has indicated that 'substantial compliance' with the regulations may suffice to meet § 1133's mandate of full and fair review, even when an individual communication from the administrator does not strictly meet those requirements." Cook v. N.Y. Times Co. Long-Term Disability Plan, No. 02 Civ. 9154 (GEL), 2004 WL 203111, at *6 (S.D.N.Y. Jan. 30, 2004) (citing Burke v. Kodak Ret. Income Plan, 336 F.3d 103, 107-109 (2d Cir. 2003)). In this context, "[s]ubstantial compliance means that the beneficiary was supplied

with a statement of reasons that, under the circumstances of the case, permitted a sufficiently clear understanding of the administrator's position to permit effective review." Cook, 2004 WL 203111, at *6 (internal quotations omitted).

The Court finds, based on the administrative record and MetLife's communications to Palmiotti and his representatives, that Palmiotti was not afforded a full and fair review of the denial of his LTD benefits as mandated by ERISA and the Plan's claims review provisions (see Sullivan Aff., Ex. A at ML 0636). He was not specifically informed about the testing deficiency issues documented by a registered nurse on the May 15, 2003, section of his transcript history prior to submitting his November 12, 2003, appeal. (See Sullivan Aff., Ex. B at ML 0013; Riemer Aff., Ex. C.) More importantly, he was not given an opportunity to supplement his appeal with neurological testing, stress quantification, and evidence of fatigue and other data acceptable to MetLife. He was made aware of these issues, which were identified by Dr. Jares, only after the final December 30, 2003, decision denying his LTD benefits. (See Sullivan Aff., Ex. B at ML 0339-0341.) Nor was Palmiotti given an opportunity to provide transcriptions or other explanations of his physicians' handwritten treatment notes. These omissions are particularly significant because MetLife had instructed Dr. Jares not to contact the treating doctors, thereby depriving him of a means of obtaining clarifications of notes Dr. Jares found illegible, and also because MetLife specifically asked Dr. Jares what further information would be necessary to establish Palmiotti's claim. Dr. Jares identified the types of information he found lacking and offered to review such information if obtained. MetLife never communicated to Palmiotti the need for that information, choosing instead simply to issue a final benefit denial on appeal. (See id. at ML 0327, 0329, 0335-6, 0339-41.)

The Court further finds that MetLife did not substantially comply with its obligation to provide a full and fair review of Palmiotti's benefit claim. MetLife did not provide Palmiotti with a "sufficiently clear understanding" of its position to permit an effective review by Palmiotti or his counsel of its initial denial of benefits. MetLife did not provide notice to Palmiotti prior to its December 30, 2003, final decision that Palmiotti needed to submit objective evidence supporting his subjective complaints of stress, fatigue, and depression. The instant facts are distinguishable from those in <u>Winkler v. Metropolitan Life Ins. Co.</u>, 03 Civ. 9656, 2005 WL 911862, at *1 (S.D.N.Y. Apr. 18, 2005), <u>vacated</u> and <u>remanded</u> <u>on</u> <u>other</u> <u>grounds</u>, No. 05 Civ. 2447 (2d Cir. March 8, 2006), upon which MetLife relies and in which the district court concluded that MetLife had substantially complied with its obligations of full and fair review. <u>Id.</u> at *6. In that case, while MetLife had failed to mention that the claimant's "file lacked 'cognitive/near-psychological testing' until its final denial letter," MetLife had previously mentioned that objective medical evidence "in the form of 'office notes and/or test results'" was required. <u>Id.</u> The court found that MetLife had substantially complied with its obligation because the claimant had been afforded an opportunity to correct the stated deficiencies in his claim. <u>Id.</u>

Palmiotti was not afforded a similar opportunity to perfect his claim. The initial May 28, 2003, denial letter merely indicated that the medical documentation did not support the "severity" of Palmiotti's condition or "how it impaired his ability to work at his occupation." (<u>Id.</u> at ML 0083-0084.) MetLife did not respond to Palmiotti's attorney's request for information as to what additional material or information was necessary to perfect his claim. (Riemer Aff., Ex. C at 2.) Palmiotti supplemented his application with his own testimony as to the severity of his

problems, further documentation of his medical treatment, and further details of Dr. Apatoff's

clinical analysis.  It was only in its final December 30, 2003, denial of LTD benefits that MetLife

mentioned the need for quantification of the stress-related issues and objective testing of

Palmiotti's subjective complaints.  (See Sullivan Aff., Ex. B at ML 0339-0341.)

The Court finds that MetLife's appellate determination denying Palmiotti LTD

benefits was arbitrary and capricious.  The Court is mindful that, under the arbitrary and

capricious standard of review, "the court must grant significant deference to the claims

administrator's determination."  Billinger v. Bell Atlantic, 240 F. Supp. 2d 274, 282 (S.D.N.Y.

2003), aff'd, 2005 WL 154270 (2d Cir. 2005).  The administrator's decision can only be

considered "arbitrary and capricious [if it] is without reason, unsupported by substantial evidence

or erroneous as a matter of law."  Zervos v. Verizon N. Y., Inc., 277 F.3d 635, 646 (2d Cir. 2002).

If the district court concludes that the decision was arbitrary and capricious, "it must remand . . .

with instructions to consider additional evidence unless no new evidence could produce a

reasonable conclusion permitting denial of the claim or remand would otherwise be a 'useless

formality.'"  Miller v. United Welfare Fund, 72 F.3d 1066, 1071 (2d Cir. 1995); Zervos, 277 F.3d

at 648-649 (finding that remand is inappropriate when the administrative record could only be

read to support granting coverage).

MetLife's decision on Palmiotti's appeal was unsupported by substantial evidence

because it was not based on a full and fair review of the initial decision and because material

information was either ignored or was not solicited, and the information upon which MetLife did

rely was fraught with errors.  The decision relied on Dr. Jares' report (see Sullivan Aff., Ex. B at

ML 0332-0336), which mischaracterized Palmiotti's job (see id. at ML 0335, "Mr. Palmiotte

retains ability to work in his own occupation as a financial advisor/consultant. . . . His occupation is namely [sic] that of a sedentary intellectual rather than physical one."), ignored elements of the job description that was part of the record on appeal (see, e.g., id. at ML 0078-0079, describing position as "Salesperson" and specifying "Travel as required"), and appears to have ignored the fatigue-related subjective assessments of Palmiotti's doctors because they "are not quantifiable in a scientific manner." (Id. at ML 0335.) Dr. Jares also appears to have ignored the primary physician's treatment notes because he found them illegible. (Id. at ML 0333; Pl.'s Rule 56.1 and Def.'s Resp. ¶¶ 108.) There is also no indication that Dr. Jares, or any other qualified medical expert, considered the significance of the additional subjective information and treatment notes pertaining to Palmiotti's daily life activities and the effect of his condition that Palmiotti submitted in connection with his appeal. (See Palmiotti Aff., Sullivan Aff., Ex. B at ML 0158-0161; Dr. Apatoff's notes concerning daily physical difficulties, id. at ML 0334.) In fact, Dr. Jares' recitation of Palmiotti's daily life activities (id. at ML 337-338) is facially inconsistent in many ways with information provided in Palmiotti's Affidavit and doctors' notes. (Compare "I am unable to run at all," Palmiotti Aff.; with "Mr. Palmiotte . . . is still able to run although for short distance," Dr. Jares' report, ML 0159, 0335.)

In light of the limitations MetLife placed on Dr. Jares' review (not allowing contact with the treating physicians), the lack of medically qualified review of the subjective information, the apparent rejection of the fatigue and stress-based medical assessments as not scientifically quantifiable, and the failure to give Palmiotti the opportunity to supplement his application to address the deficiencies identified by Dr. Jares, MetLife's appellate decision, which was based principally on Dr. Jares' report, was lacking a basis in substantial evidence, without

reason, and, thus, arbitrary and capricious.

Although the Court finds that MetLife's decision was arbitrary and capricious, the Court does not find the current record so clear or compelling as to warrant an order directing MetLife to provide LTD benefits to Palmiotti. The Court therefore vacates MetLife's denial of Palmiotti's application for LTD benefits and remands the matter to MetLife for reconsideration. Palmiotti must be afforded an opportunity to supplement his appellate submissions with additional information in light of Dr. Jares' report and any further reports considered, or internal deliberations by MetLife, that may identify deficiencies in the type or quantity of information provided in support of Palmiotti's claim. As a matter of "full and fair" review, the Court also requires that, prior to any final determination denying benefits, MetLife disclose to Palmiotti, for an opportunity to respond to or rebut, the information upon which it expects to base its decision, to the extent such information was not previously disclosed. See, e.g., Miller v. United Welfare Fund, 72 F.3d 1066, 1074 (2d Cir. 1995) (pursuant to a remand, court permitted claimant to provide additional evidence to rebut any evidence on which the administrator could rely to deny benefits).

CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment is denied in its entirety and Plaintiff's motion for summary judgment is granted to the extent that MetLife's denial of Palmiotti's application for LTD benefits is vacated and the matter is hereby remanded to MetLife for further consideration in a manner consistent with this Opinion and Order. Plaintiff's summary judgment motion is denied in all other respects. The Clerk of Court is respectfully

requested to close this case.

SO ORDERED.

Dated: New York, New York
March 27, 2006

LAURA TAYLOR SWAIN
United States District Judge

Copies mailed 3/27/06
Chambers of Judge Swain